AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of Connecticut

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Todd Miller | ) | Case No. 3:18 MJ 611-JAM |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __March 18, 2018__ in the county of __Fairfield__ in the _____ District of __Connecticut__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1038(a)(1) | False Information and Hoaxes |

*FILED 2018 APR -9 P 1:49 U.S. DISTRICT COURT NEW HAVEN, CT.*

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
Complainant's signature

FBI Task Force Officer Daniel Sentementes
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 4/9/18

/s/ Jeffrey Alker Meyer, USDJ
*Judge's signature*

City and state: New Haven, Connecticut      Hon. Jeffrey Alker Meyer, U.S. District Judge
*Printed name and title*

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Connecticut

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Cell phone in the possession of
TODD MILLER incident to his arrest

Case No. 3:18MJ611-JAM

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

located in the _____ District of ___Connecticut___ , there is now concealed *(identify the person or describe the property to be seized)*:

Cell phone in the possession of TODD MILLER incident to his arrest.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1038(a)(1) | False information and hoaxes |

The application is based on these facts:

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

FBI Task Force Officer Daniel Sentementes
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 4/9/18

City and state: New Haven, Connecticut

/s/ Jeffrey Alker Meyer, USDJ
*Judge's signature*

Hon. Jeffrey Alker Meyer, U.S. District Judge
*Printed name and title*

FILED 2018 APR -9 P 1:58 U.S. DISTRICT COURT NEW HAVEN, CT.

STATE OF CONNECTICUT

                        ss: New Haven

COUNTY OF NEW HAVEN     3:18MJ611-JAM

## AFFIDAVIT OF DANIEL SENTEMENTES

I, Daniel Sentementes, being duly sworn, depose and state as follows:

1. I am a Task Force Officer ("TFO") with the New Haven Division of the Federal Bureau of Investigation ("FBI") and have been assigned to the FBI's Joint Terrorism Task Force ("JTTF") since approximately June 2016. During the course of my assignment with the JTTF, I have conducted investigations regarding material support of terrorism, weapons violations, and other international and domestic terrorism matters. Also, from February 2009 to the present, I have been employed by the Yale University Police Department, where I have investigated narcotics cases, weapons violations, sexual assaults and other criminal violations. As part of my JTTF responsibilities, I am currently assigned to the New Haven FBI's Railroad Liaison Program, and its Weapons of Mass Destruction Program.

2. As set forth below, there is probable cause to believe that on or about March 18, 2018, TODD MILLER committed a violation of the false information and hoaxes statute, 18 U.S.C. § 1038(a)(1), by intentionally conveying false but reasonably believable information to law enforcement authorities in a series of two separate telephone communications, to the effect that an individual on an Amtrak train traveling through New Jersey, New York, and Connecticut was carrying an explosive device.

FILED 2018 APR -9 P 1:58 U.S. DISTRICT COURT NEW HAVEN, CT

3.     Accordingly, I submit this affidavit in support of: (1) a criminal Complaint and arrest warrant for TODD MILLER; and (2) a warrant to search the cell phone associated with the originating number of the telephonic, false explosive report ▇▇▇▇▇, if found to be in MILLER's possession incident to arrest, for the limited purpose of confirming that it is the same phone from which the false report was called in. In swearing to the truth of this affidavit, I rely on information conveyed to me by other law enforcement officers, written reports by other law enforcement officers, interviews I have conducted of witnesses to the events related herein, and my training and experience. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the listed violation, I have not set forth all of the information known to me concerning this investigation; instead, I have set forth sufficient information to establish probable cause to issue an arrest warrant and Complaint.

4.     On the evening of March 18, 2018, an individual identifying himself as TODD MILLER ("MILLER") called a 911 dispatcher in New Jersey and reported that he was on Amtrak Train #2256 traveling from Washington, DC towards Penn Station in New York City, and that a female passenger "has a bomb in her bag." The originating number of the call was ▇▇▇▇▇▇. MILLER described the woman as having brown hair and a scarf; he did not provide further details. As explained below, and as later determined by investigators, MILLER appears to have been mistaken about the actual train number, insofar as both he and the female passenger in question actually were traveling on Amtrak Train #2258.

5.     By the time Amtrak investigators received notice of the call and were mobilized to stop and search Train #2256, it had left Penn Station and was in Connecticut. Amtrak officials stopped the train at Green's Farm Station in Westport, Connecticut, where passengers were

directed to disembark, and bomb squad members boarded and searched the train. No evidence of any explosive device or materials was detected.

6. During the law enforcement response to Train #2256 in Westport, an Amtrak police officer in Connecticut contacted MILLER by telephone, at no. ▮▮▮▮▮ and spoke with him. MILLER, who provided his name, date of birth, and addresses, said that he had gotten off the train in New York, but that before then he had been sitting in the First Class section, and described a white female adult with red hair and a red scarf (diverging from the "brown hair" description of his 911 call). MILLER said that the woman was sitting in the middle of the First Class car; was carrying a "back bag carry on suitcase with a handle"; kept checking her bag without taking anything out; kept asking the "red cap" (believed to refer to the First Class attendant) what the next stop was; and seemed to want to get off the train and leave her bag behind. The officer detected slurring in MILLER's voice, and asked if he had consumed alcohol that day; MILLER replied that he had consumed "one glass of red wine." Asked if he suffered from mental illness, MILLER replied "no, absolutely not. This is the first time I've ever made a call like this before. I am worried for everyone on that train. Someone has to check that lady out."

7. Officers responding to Train #2256 eventually determined that it was not the train on which MILLER and the female in question had been traveling. First, no one among the passengers from Train #2256's First Class car matched MILLER's description of a white female adult with red hair and a red scarf. Second, the officers learned that Amtrak staff had ordered MILLER off his train at Penn Station owing to intoxication; but an Amtrak conductor from Train #2256 advised that no such incident had happened on Train #2256 during its Penn Station stop. Amtrak officers accordingly checked the manifests for other trains running close to the Train #2256 timetable, and discovered MILLER on the passenger list for Amtrak Train #2258. With

this information along with the confirmation that no explosive device or materials were on Train #2256, Amtrak had the latter train re-boarded and cleared to resume its travel.

8.    Soon after, Amtrak Train #2258 pulled into Green's Farm Station in Westport, Connecticut, and was stopped, inspected, and eventually found not to contain any explosive devices or materials. During the stop, Amtrak officers sought out the attendant for the First Class car, who confirmed that passenger MILLER had been removed in New York owing to his intoxication. Specifically, the attendant advised that MILLER appeared intoxicated upon boarding in Washington, and that while on the train, had consumed two glasses of wine and two "double scotch and soda" drinks. The attendant also advised that MILLER had "exchanged profanity with a female" who was sitting in a different row from him in the First Class car. She matched MILLER's initial description, of a white female with brown hair. The attendant told the officers her name and identified her for them (hereinafter, the "Subject Female"). The Subject Female did have a black bag in her possession. While near the Subject Female, one or more officers detected the smell of alcohol on her; she also stumbled while detraining along with her fellow passengers, all of whom had been directed to leave the train but to leave their baggage behind.

9.    Off the train, officers approached the Subject Female and asked if she had experienced any interaction with another passenger; she said "yeah, sort of," and provided a description of the encounter. The interview was recorded on an officer's body camera; I have reviewed both the bodycam recording and the officer's written report of the interview, in which the Subject Female described the following: MILLER had been admonished a couple of times by the train attendant for speaking too loudly; while MILLER was speaking on his phone, the Subject Female looked at him, and he said "hey, why are you looking at me?"; she did not respond

to MILLER; at some point the Subject Female was talking quietly on her phone and said, "I think I'm going to jump off when we get off in New York City, and try to buy this thing"; MILLER "sort of latched on to it, saying, 'oh she's speaking so why can't I speak?'" To be clear, the written report of interview had her saying "I think I'm going to jump off when we get off in New York City, and try to *hide* this thing"; but the bodycam recording makes clear that she said "*buy*," not "*hide*."

10. After Amtrak Train #2258 was determined to contain no explosive devices or materials, it was cleared to resume its travel.

11. More recently, I have conducted follow-up interviews regarding what happened on Amtrak Train #2258 before MILLER made his 911 call. I interviewed the First Class car attendant, who stated among other things: MILLER and the Subject Female had gotten into a screaming match with each other in the First Class car; there was at least one row of seats between the positions where MILLER and the Subject Female were respectively seated; the Subject Female did not appear to be checking her luggage, although she had a pocketbook next to her into which she periodically reached for items such as her phone; the Subject Female had told the attendant that she wanted to briefly get off the train in Penn Station to buy a calendar, but the attendant advised that she probably would not have time to do that and get back on the train before it departed.

12. I also recently interviewed the Subject Female, who stated among other things: she was separated from MILLER by more than one row of seats, and given the height of the seat backs, there was no clear line of sight between them while in sitting positions; she had a purse on the floor by her feet, into which she occasionally reached for items like her phone, accessories, and wallet, but those actions would have been difficult to observe from MILLER's seat; she had a

larger, carry-on tote bag in the overhead rack, but she never reached up or into that bag during the train ride; during the trip, MILLER's behavior was loud and belligerent; she denied having a loud argument with MILLER, but reported that at some point he directed a comment to her about her hair; the comment was unwelcome, and she turned to look at MILLER in a non-friendly manner; MILLER responded hostilely, with words to the effect of, "What are you lookin' at?"; later at the New York Penn Station stop, she did want to step off briefly to buy a calendar as a gift for a friend; and she did walk over to the attendant, in a direction away from MILLER, to ask about that.

13.  The foregoing facts indicate that the Subject Female was not carrying any explosives; was not checking what MILLER described as her "carry on suitcase with a handle"; was not "checking her bag without taking anything out" as MILLER claimed; would have been largely or entirely out of MILLER's view unless he repeatedly stood up to observe her over or around the intervening seat row(s); and that MILLER and the Subject Female had engaged in a hostile encounter, apparently initiated by MILLER, which by her recollection amounted to her rebuffing his social overture and his responding negatively; and that MILLER already had been manifesting a belligerent behavior pattern throughout the trip.  Accordingly, the evidence supports the conclusion that MILLER, motivated by some perceived grudge against the Subject Female, knowingly, intentionally, and falsely made an emergency 911 call to law enforcement accusing her of carrying a bomb; and that when contacted by law enforcement while the public safety response still was ongoing, made a deliberate choice to continue conveying false information in order to maintain and enhance the believability of his initial false bomb report.

14.  Amtrak has advised that four trains experienced delays as a result of the response to MILLER's false explosive report; the following chart lists Amtrak's tally of the delay times and

the number of passengers aboard each train. I also have included calculations of the cumulative impact of those delays, by adding up the lost time for all passengers of the four trains:

| Train # | Delay | # Passengers | Cumulative delay |
|---|---|---|---|
| 2256 | 1 hour 22 min. | 219 | 299 person-hours |
| 2258 | 1 hour 5 min. | 195 | 211 person-hours |
| 2275 | 50 min. | 228 | 190 person-hours |
| 139 | 27 mon. | 503 | 226 person-hours |
| **TOTALS** | | 1,145 | 926 person-hours |

The cumulative 926 person-hours attributable to these forced delays equals 38 and a half days. Separate and apart from the impacts on passengers of MILLER's false explosives report was the disruption to law enforcement and public agency operations from their necessary response. This includes deployments of teams of officers and managers from several agencies, including the following: Metropolitan Transit Authority; Connecticut State Police and members of its Bomb Squad; Federal Bureau of Investigation Joint Terrorism Task Force and Special Agent Bomb Tech; Westport, Connecticut Police Department; Metro-North Railroad Representatives; and Amtrak Representatives.

## CONCLUSIONS

15. Based on the foregoing, there is probable cause to believe, and I do in fact believe, that MILLER has committed a violation of federal law, consisting of a violation of the hoax/threat statute, 18 U.S.C. § 1038(a)(1). Accordingly, I respectfully request that the Court issue a warrant for the arrest of MILLER.

16. Based on the foregoing, there is probable cause to believe, and I do in fact believe, that MILLER used a cell phone assigned the number ▓▓▓▓▓▓▓ to commit the above offense. In the event that MILLER is found to be in possession of a cell phone incident to his arrest, I respectfully request that the Court issue a warrant to search the phone for the limited purpose of

(a) confirming that the phone is assigned that same number, and (b) that the call history documents the March 18, 2018, call to the New Jersey 911 dispatch center.

### REQUEST TO SEAL

17. This affidavit and the Complaint it supports contain information concerning an ongoing criminal investigation and a decision to seek the arrest and charging of a defendant who is presently at large. Disclosure of the affidavit or Complaint prior to arrest may encourage the defendant to flee and evade apprehension, and to conceal or destroy inculpatory evidence to which he may have access. Accordingly, the Government respectfully requests that this affidavit, the Complaint it supports, and the arrest warrant issued thereon be ordered sealed by the Court, until further order of this Court, except that the arrest warrant may be disclosed to other law enforcement officers to the extent necessary to locate and arrest the defendant.

Daniel Sentementes
Task Force Agent
Federal Bureau of Investigation

Sworn and subscribed before me this
_____ day of April, 2018.

___/s/ Jeffrey Alker Meyer, USDJ___
HONORABLE JEFFREY ALKER MEYER
UNITED STATES DISTRICT JUDGE

- 8 -